File Name: 05a0801n.06
Filed: September 23, 2005
NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MBAYA NDIAYE, | ) | |
| | ) | |
| Petitioner, | ) | ON PETITION FOR REVIEW OF A |
| | ) | DECISION OF THE BOARD OF |
| v. | ) | IMMIGRATION APPEALS |
| | ) | |
| ALBERTO GONZALES, ATTORNEY | ) | |
| GENERAL, | ) | OPINION |
| | ) | |
| Respondent. | ) | |
| | ) | |

**Before: NELSON and GILMAN, Circuit Judges; and DONALD, District Judge.**[*]

**BERNICE BOUIE DONALD, District Judge.** Mbaya Ndiaye ("Ndiaye" or "Petitioner")

seeks review of the Board of Immigration Appeals' ("BIA") decision affirming the Immigration

Judge's ("IJ") denial of her requests for asylum and the withholding of removal under the

Immigration and Nationality Act ("INA"), and for protection under the Convention Against Torture

("CAT"). For the reasons that follow, we **GRANT** the petition for review, **VACATE** the decision

of the BIA, and **REMAND** for further proceedings to determine whether Ndiaye is entitled to the

relief she seeks.

## I. BACKGROUND

---

[*]The Honorable Bernice Bouie Donald, United States District Judge for the Western District of Tennessee, sitting by designation.

Petitioner is a Wolof from Mauritania. Ndiaye's husband was in the Mauritanian military and came home every week to see her. When he had not been home for two weeks, Ndiaye claims that six soldiers came to her home to retrieve her husband's papers and beat Ndiaye, resulting in Ndiaye's toe being broken. A few days later, Ndiaye alleges that several soldiers came back to her home. Petitioner asserts that two of them raped her while the others held her down. The next day, an Arab neighbor told Ndiaye that her husband had likely been killed and that it would be in Ndiaye's best interest to take her children and leave the area. A day or two after the rape, Ndiaye took her children to Richatol, Senegal, where they stayed with Ndiaye's aunt for a year. She then moved to Pikine Cefa, where she worked for five years, saving her money to come to the United States.

Using a passport that was not hers, Ndiaye traveled to the United States on April 4, 1997 and timely filed an application for asylum. However, the man who assisted her in filling out her application did not speak Wolof very well and did not read the application back to Ndiaye. Petitioner is illiterate and could not read the application herself. On June 4, 1999, Ndiaye filed a supplementary asylum application with the assistance of counsel.

Petitioner applied for asylum and withholding of removal on July 26, 1997. Her hearing was held on February 4, 2003. The IJ denied her applications for asylum and withholding of removal, and Ndiaye appealed that decision. The BIA affirmed the decision of the IJ without opinion on June 1, 2004.

The BIA adopted the findings of the IJ that Ndiaye was not credible and did not demonstrate a well-founded fear of future persecution. The IJ thus found that Ndiaye was not eligible for any

of the relief that she sought. Ndiaye timely filed her petition for review with this Court on June 29, 2004.

## II. JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to review Petitioner's administratively exhausted claims pursuant to 8 U.S.C. § 1105a(a), modified by section 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Because the BIA affirmed the IJ's decision without opinion, the Court reviews the IJ's decision as the final agency order under the "substantial evidence" standard. Mullai v. Ashcroft, 385 F.3d 635, 638 (6th Cir. 2004) (citing Denko v. I.N.S., 351 F.3d 717, 730 (6th Cir. 2003)). The substantial evidence standard requires the Court to uphold the IJ's decision if it is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. (quoting Koliada v. I.N.S., 259 F.3d 482, 486 (6th Cir. 2001)). Moreover, we may not reverse "simply because [we are] convinced that [we] would have decided the case differently." Id. (quoting Adhiyappa v. I.N.S., 58 F.3d 261, 265 (6th Cir. 1995)). "Rather, in order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed compels it." Id. (quoting Klawitter v. I.N.S., 970 F.2d 149, 152 (6th Cir. 1992)). The standard under which a judicial review of an immigration judge's order is conducted is highly deferential. The IJ's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Id.; 8 U.S.C. § 1252(b)(4)(B). "This standard does not mean, however, that we must accept the IJ's credibility

findings carte blanche. Rather, we must still subject these findings to meaningful judicial review."

Nwakanma v. Gonzales, 126 Fed.Appx. 699, 700 (6th Cir. 2005).

### III. ANALYSIS

Petitioner bears the burden of establishing that she is a refugee eligible for asylum either because she has suffered actual past persecution or because she has a well-founded fear of future persecution. 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a); I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Additionally, in the absence of a well-founded fear of future persecution, an asylum applicant may be eligible for Chen humanitarian asylum if the applicant establishes "compelling reasons for being unwilling or unable to return to [his or her] country arising out of the severity of the past persecution. . . ." 8 C.F.R. § 1208.13(b)(1)(iii)(A); In re Chen, 20 I&N. Dec. 16 (BIA 1989).

Pursuant to 8 U.S.C. § 1158(a), the Attorney General has discretion to grant asylum to a "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A). "The disposition of an application for asylum involves the following two-step inquiry: (1) whether the applicant qualifies as a 'refugee'. . . , and (2) whether the applicant 'merits a favorable exercise of discretion by the Attorney General.'" Mikhailevitch v. I.N.S., 146 F.3d 384, 389 (6th Cir. 1998) (quoting Perkovic v. I.N.S., 33 F.3d 615, 620 (6th Cir.1994)). A "refugee" is "an alien who is unable or unwilling to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Id. (quoting Elias-Zacarias, 502 U.S. at 481).

The IJ found that Ndiaye was not credible. The IJ noted that if Petitioner were credible, he would exercise his discretion and grant her asylum application "unhesitatingly." Thus, the credibility determination is the primary issue for review on this appeal.

Determinations as to credibility are findings of fact, which, in political asylum cases, are reviewed under the substantial evidence standard. See Yu v. Ashcroft, 364 F.3d 700, 702 (6th Cir. 2004). A finding of a lack of credibility may be reversed only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. 1252 (b)(4)(B). The essential element to a finding of a lack of credibility is that the discrepancies must go to the heart of the petitioner's claim. See Daneshvar v. Ashcroft, 355 F.3d 615, 619 (6th Cir. 2004). Furthermore, there is a difference between major and minor inconsistencies. See Huang v. Ashcroft, 113 Fed.Appx. 695, 700 (6th Cir. 2004) (citing Yu, 364 F.3d at 703-04). "Major inconsistencies go to the heart of a petitioner's asylum claim. In contrast, minor inconsistencies reveal nothing about petitioner's persecution and therefore are an inadequate basis for an adverse credibility finding, though they can give supplemental support to an adverse credibility finding premised on other grounds." Id.

In making his determination that Petitioner was not credible, the IJ was concerned with omissions or discrepancies in the testimony of Petitioner, specifically, 1) where Petitioner's husband was stationed and his military rank; 2) the length of time between the two incidents when the soldiers came to her house and the number of soldiers who came each time; 3) the length of time after the second incident before she left for Senegal; 4) the fact that Petitioner failed to name one of her children in the supplemental application and her inability to give the child's birth date; 5) exactly where in Mauritania Petitioner lived; 6) the fact that Petitioner's late husband and the father

of her child born in the United States had the same birthday; 7) the omission of her broken toe in her application; and 8) the accuracy of the translation of a letter from Petitioner's aunt and its lack of signature.

Ndiaye testified that her husband was stationed in Rosso, although her supplemental application stated that he was stationed in Nouadhibou. However, she clarified this discrepancy when she testified that some people called the city in which her husband was stationed Rosso and some people call it Nouadhibou. Additionally, the IJ was concerned with the fact that Ndiaye referred to her husband as a lieutenant and at other times referred to him as a sergeant. However, she testified that she was unsure of the correct word because the name of his rank is a French word that does not translate into Wolof. This explanation sufficiently clarifies the reason for the discrepancy, leaving the issue entirely insignificant.

Next, the IJ found important the discrepancies in Ndiaye's testimony concerning the length of time between the two incidents she described of the soldiers coming to her home and the number of soldiers who came each time. However, these inconsistencies do not go to the heart of Petitioner's claim. Ndiaye has consistently reported that, following the death of her husband, there were two incidents when soldiers came to her home. The first time, they demanded her husband's papers and beat her. The second time, several soldiers entered her bedroom. Some of them held her down while two of them raped her. These incidents go to the heart of Petitioner's claim, and she has described them consistently. The length of time between the incidents and the precise number of soldiers who entered her home are minor inconsistencies that reveal nothing about Ndiaye's persecution. Therefore they are inadequate bases for an adverse credibility finding.

Similarly, the length of time following the second offense before Ndiaye left Mauritania is insignificant and does not go to the heart of Petitioner's claim. Thus, it is not an adequate basis for the IJ's adverse credibility finding.

The IJ found it significant that Ndiaye failed to name one of her children in her supplemental application. However, the application had only two blanks for children's names. Prior to the hearing, Ndiaye amended the supplemental application to include the name of the third child. Thus, this is no inconsistency at all. Her inability to remember the child's birthday is similarly inconsequential.

The other discrepancies or omissions could only be characterized as minor inconsistencies that reveal nothing about Petitioner's fear for her safety. They are an inadequate basis for the adverse credibility finding. For example, the IJ found it unsettling that Ndiaye could not specify where in Mauritania she lived, the fact that Petitioner's late husband and the father of her child born in the United States had the same birthday, and the omission of her broken toe in her application. However, each of these inconsistencies or omissions is insignificant or has been explained adequately by Petitioner.

Finally, the IJ questioned the accuracy of the translation of a letter received from Petitioner's aunt in Senegal and its lack of signature. Although these could be reasons for the IJ to choose to disregard the letter, they do not provide a basis for a finding of incredibility.

Each of the inconsistencies or omissions with which the IJ was concerned involves 1) the original application which, as noted *supra*, should not be considered, 2) is insignificant, or 3) has been explained adequately by Petitioner. None of the inconsistencies bolster Ndiaye's claim. "If

discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." Nwakanma 126 Fed.Appx. at 701 (citations omitted).

In Nwakanma v. Gonzales, the IJ based his decision on inconsistencies such as the number of men who searched the petitioner's home, the number of times his home was attacked, inconsistencies in dates, and events that were described in the application that were omitted during testimony. Nwakanma, 126 Fed.Appx. at 701. This Court held that the inconsistencies were "irrelevant and do not support an adverse credibility finding." Id. at 702.

Similarly, in the instant case, the minor inconsistencies discussed above are irrelevant and do not support a finding of incredibility. The grounds cited by the IJ in finding a lack of credibility were "minor inconsistencies that reveal nothing about [Ndiaye's] persecution and therefore are an inadequate basis for an adverse credibility finding." Huang,113 Fed.Appx. at 700. Thus, the IJ's finding that Petitioner was not credible was not supported by substantial evidence. Accordingly, we vacate the IJ's adverse credibility finding.

The BIA based its decision on Ndiaye's alleged lack of credibility. In light of our reversal of the BIA's credibility determination, we remand to the BIA for further consideration of Ndiaye's claims of past persecution and well-founded fear of future persecution. See Sylla v. I.N.S., 388 F.3d 924, 930 (6th Cir. 2004) (finding that the record did not support the BIA's adverse credibility finding and remanding the case to the BIA for further proceedings); Huang,113 Fed.Appx. at 700 n. 4 (noting that when the court reverses an adverse credibility finding, "remand to determine whether [the petitioner] qualifies as a refugee is the appropriate remedy"); see also I.N.S. v. Orlando Ventura, 537 U.S. 12, 16-17 (2002) ("[A] court of appeals should remand a case to an agency for

decision of a matter that statutes place primarily in agency hands. This principle has obvious importance in the immigration context.").

## IV. CONCLUSION

For all of the reasons set forth above, we **GRANT** the petition, **VACATE** the decision of the BIA, and **REMAND** for further proceedings to determine whether Petitioner is entitled to the relief she seeks.

**RONALD LEE GILMAN, Circuit Judge, dissenting.** Although the majority articulates the appropriate legal standard for reviewing the BIA's decision, I believe that it has failed to actually apply that standard to the facts of this case. Specifically, I disagree that "any reasonable adjudicator would be compelled to conclude to the contrary" with regard to the IJ's adverse credibility determination. 8 U.S.C. § 1252 (b)(4)(B). Several inconsistencies cited by the IJ in fact "go to the heart of the applicant's claim." *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004) (citations omitted). They are not, as the majority states, "irrelevant." (Majority Op. at 8)

This is not to say that all of the inconsistencies discussed by the IJ are of equal weight. For example, Ndiaye's conflicting statements about her husband's military rank, about where she lived in Mauritania, and about the date of birth of one of her children are clearly not the kinds of inconsistencies that "go to the heart of the applicant's claim," *Sylla*, 388 F.3d at 926.

My concern, however, lies with Ndiaye's conflicting statements about the details surrounding the two attacks that were allegedly directed against her. In her second application for asylum, for example, Ndiaye stated that the soldiers entering her house during the first visit were merely looking for things belonging to her husband. She does not mention violence of any kind. During the asylum hearing itself, however, Ndiaye testified that these soldiers physically assaulted her, resulting in a broken toe.

There is also conflicting testimony regarding the time frame of the events in question. Ndiaye said on direct examination that there were fifteen days between the two visits by the soldiers. But on cross-examination she said that there were only three days between the two incidents. Ndiaye also testified at the asylum hearing that she was abducted by the soldiers who raped her and

that they kept her in a camp for three days. Upon further questioning, however, Ndiaye recanted that version and said that the "true story is that I was raped and I left on my own."

In addition, the record is conflicting with regard to when Ndiaye left Mauritania for Senegal. She stated in her original application that she first went to a refugee camp for three weeks. Admittedly, this application, as the majority notes, is not reliable. This might explain why, when questioned on the point during cross-examination, Ndiaye testified that she left for Senegal three days after the second attack, during which time she was allegedly held captive by the soldiers. But she immediately changed her story yet again, testifying that she had never been held captive and that she had left for Senegal the day after she was raped by the soldiers.

These inconsistencies go to the heart of her claim because they suggest that the attacks in question might never have happened. If they had, one would expect Ndiaye to have been able to recount the factual details surrounding the attacks and her departure for Senegal far more clearly and consistently. I therefore disagree with the majority that these inconsistencies are simply irrelevant. (Maj. Op. at 8)

In sum, I believe that there is substantial evidence supporting the IJ's adverse credibility determination. Although another IJ might have decided the present case differently, there are enough inconsistencies regarding the alleged attacks to prevent a reasonable adjudicator reviewing these facts from being "compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)); *see also Sylla*, 388 F.3d at 925 (explaining that the substantial-evidence standard used in reviewing credibility determinations "is a deferential standard: A reviewing court should not reverse simply because it is convinced that it would have

decided the case differently") (citation and quotation marks omitted).  I therefore believe that the

appropriate disposition of this case is to deny Ndiaye's petition for review on the basis of the IJ's

adverse credibility determination.